UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 26-cr-19 |
| | ) | |
| JOSE IGNACIO | ) | |
| DE LA CRUZ DE LA ROSA, | ) | |
|     Defendant | ) | |

## <u>DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR DETENTION</u>

NOW COMES Jose Ignacio De La Cruz De La Rosa, through counsel, and submits this partial response to the government's motion for detention. The government's motion for detention relies principally on the seriousness of the charges in this case. The central problem with this argument is that the charges involve the same allegations that the government raised last summer. While the government now also alleges that Mr. De La Cruz obtained, or attempted to obtain, drivers privilege cards and learner's permits for individuals who were not Vermont residents, this is not a new fact and does not show a serious risk of flight. Nor does it show that there are "no conditions that will reasonably ensure his continued appearance." Instead, what weighs most heavily against the government's claims is the fact that Mr. De La Cruz continued to fight for release notwithstanding the government's allegation and—once he was released on conditions by an immigration court—he has abided by those conditions. This shows conclusively that there is no serious risk of flight and that there are conditions of release that will reasonably

[1]

assure his continued appearance.  To the extent that the Court perceives some lingering risk of flight, the Court could require the payment of a bond in this case and could impose a location monitoring condition.

## I.    Background and related habeas proceedings.

Mr. De La Cruz and his step-daughter were detained by immigration authorities on June 14, 2025.  *See De La Cruz v. Trump et al*, no. 25-cv-580; *Perez Alfaro v. Messier et al*, no. 25-cv-584 (D.Vt.).  As part of the habeas proceedings, Mr. De La Cruz filed a *Motion for Immediate Release Under Mapp v. Reno*, doc. 16, which he incorporates by reference.  The motion describes in detail Mr. De La Cruz's ties to Vermont; his long-term employment in the area; his work with local organizations, including Migrant Justice; and the broad support he enjoys in the community.  The habeas proceedings ended after Mr. De La Cruz was released on conditions by an immigration court in Massachusetts.

## II.    Mr. De La Cruz was released on conditions by an immigration court and has abided by those conditions for more than 8 months.  This alone shows there is no serious risk of flight and that there are conditions that will reasonably assure his continued appearance.

### a. The government must show that there is risk of flight that greatly exceeds the risk exhibited by the average federal defendant.

The Bail Reform Act authorizes a detention hearing in cases such as this only if there is a "a serious risk of flight." 18 U.S.C. § 3142(f)(2)(A).  A "'serious risk of flight' under § 3142(f)(2)(A) is a great risk – beyond average – that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d

[2]

1131, 1138 (D. Idaho 2023).[1]  Courts in the Second Circuit have adopted this definition or similar ones.  In *United States v. Romero-Martinez*, 2024 WL 965150 at *4 (D. Conn. Mar. 6, 2024), the court adopted the *Figueroa-Alvarez* definition as did the court in *United States v. Terrance*, 2025 WL 782340 at *6 (N.D.N.Y. Jan. 10, 2025).  Similarly, in *United States v. Perez-Vasquez*, 779 F. Supp. 3d 248, 254 (N.D.N.Y. 2025), the court noted the adoption of the *Figueroa-Alvarez* standard and observed that "[o]ther courts in the Second Circuit have defined a 'serious risk of flight' as a 'grave' or 'real' risk, or as a 'significant' risk, or they have simply given the phrase 'serious risk' its plain and ordinary meaning."

By whatever definition, the requirement is that the government show a risk of flight that is serious and that greatly exceeds the risk exhibited by the average federal defendant.  This is no small task because federal defendants flee prosecution at extraordinarily low rates.  Research demonstrates that released federal defendants fail to appear for at least one court appearance only 1.7% of the time.  Thomas H. Cohen, et. al., *Revalidating the Federal Pretrial Risk Assessment Instrument (PTRA): A Research Summary*, 82 Federal Probation 23, 26 (2018).  The Federal Judicial Center's treatise on the Bail Reform Act notes the same thing:

> In general, "statistics show that pretrial services supervision provides a safe and cost-effective alternative to pretrial detention"—for the one-year period ending March 31, 2016, "less than one percent of the defendants released to supervision were revoked due to a felony re-

---

[1] *See also* Jefri Wood, *The Bail Reform Act of 1984* at 18 (Federal Judicial Center, 4th ed., 2022) ("The inquiry under (f)(2), however, is not categorical but rather requires an individualized assessment of the particular defendant—whether *this* defendant is a *serious* risk to flee" (emphasis in original)).

[3]

arrest and fewer than one percent failed to appear in court as directed. Even technical violations . . . were low at 12 percent."

Jefri Wood, *The Bail Reform Act of 1984* at 14 (Federal Judicial Center, 4th ed., 2022). That rate has held constant even when release rates rose during the COVID-19 pandemic. *Id.* at n.64.

Flight from prosecution is not the same as failing to appear for a court appearance, the terms are not synonymous. Instead, flight from prosecution is a subset of the larger category of failing to appear for a court appearance. *United States v. White*, 2021 WL 2155441 at *8 (M.D. Tenn.) ("It would seem that 'risk of flight' is a subset of 'risk of non-appearance'—meaning that, depending on the circumstances suggesting a serious risk of non-appearance, a risk of non-appearance may not entail a risk of flight."). With only approximately 1.7% of released defendants failing to appear and with actual flight from prosecution occurring at an even lower rate, the government's burden under § 3142(f)(2) is to show a risk that is many times higher than this extraordinarily low rate.

Further, courts have explained that the idea that undocumented individuals are more likely than documented individuals or citizens to flee prosecution is mistaken:

> Alien defendants who illegally enter this country, or illegally re-enter this country after removal, do so for many reasons: to flee political persecution in their home country, to flee drug-related violence in their home country, to pursue greater economic opportunity in this country, and to follow friends or family members who already live in this country, just to name a few. But they share a common trait: they voluntarily chose to come to this country and stay here. Presuming that they are any more likely than non-alien defendants to leave this country or the

[4]

> jurisdiction to avoid prosecution – just because they came here from another country – is misplaced.

*Figueroa-Alvarez*, 681 F. Supp. 3d at 1139–1140.  Other courts have gone further and observed that a history of illegal entry into the United States cannot be equated to a serious risk of flight.

Thus, in *United States v. Romero-Martinez*, 2024 WL 965150 at \*4 (D. Conn.), the court overturned the initial decision to detain the defendant and rejected the government's contention "that a risk of flight may be inferred from the fact that Romero-Martinez has a long history of disobeying the law by means of entering and re-entering the United States unlawfully."  At a minimum, the repeated illegal entries cuts both ways:  "because Romero-Martinez's family ties in Connecticut are very strong, this argument sharply cuts the other way as well. It tends to show that Romero-Martinez's commitment to be with his family in Connecticut—rather than to hide out in Honduras or elsewhere—is so compelling that he will break the law and risk his freedom to do so."  *Id*.  The court further explained that:

> The relevant inquiry at this point is Romero-Martinez's risk of flight, not his general propensity to break the law.  Although these inquiries overlap to some degree, if the facts of a case suggest that a defendant's primary motive for breaking the law is to enter and remain in the jurisdiction where he is subject to prosecution, these facts make the connection between general law breaking and risk of flight more tenuous.  "Indeed, the very act of illegally reentering the United States—knowing that reentry subjects the alien defendant to a potential prison term and certain deportation thereafter—demonstrates a firm resolve to reside in this country, especially when done multiple times."

*Id*.  This rationale holds here as well.

[5]

### b. There is no serious risk of flight in this case.

Mr. De La Cruz's habeas case ended when he was released on conditions by a Massachusetts immigration court. The conditions included a $10,000 bond. Since he was released, Mr. De La Cruz has abided by those conditions. And, he has followed the conditions notwithstanding the threat of serious criminal charges. This alone belies any claim that there is a serious risk of flight or that there are no conditions that will reasonably assure his continued appearance.

Importantly, when it imposed those conditions, the immigration court did so because Mr. De La Cruz had shown that he did not pose a danger to the community and was not a flight risk. *See* 8 C.F.R. §§ 236.1(c)(8), 1236.1(c)(8). This is a far higher standard than is set by the Bail Reform Act in 18 U.S.C. § 3142. Section 3142(f) requires that the government show that there is a serious of flight to even warrant a detention hearing. Even if a hearing is warranted, the Bail Reform Act requires that the court release the defendant unless the government shows that there are no "conditions of release that will reasonably assure the appearance of the person as required."

Beyond the fact that Mr. De La Cruz has been on conditions of release for eight months already, the government's claim that there is a serious risk of flight is undercut by the government's own actions. This includes the fact that the government waited some seven months (from July until February 19) to even obtain an indictment. It then waited another month before arresting Mr. De La Cruz. Clearly, the government had no actual concern about flight in this case. Instead, it

[6]

knew exactly where it would be able to find Mr. De La Cruz because he had been released on conditions and was following those conditions.

Even if the government is correct that Mr. De La Cruz returned to Mexico in 2022 for a brief period of time, this does not show a risk of flight, let alone a serious risk of flight. Instead, it shows a firm and abiding commitment to his family as well as to living and working in Vermont. *Romero-Martinez*, 2024 WL 965150 at *4 ("the very act of illegally reentering the United States—knowing that reentry subjects the alien defendant to a potential prison term and certain deportation thereafter—demonstrates a firm resolve to reside in this country, especially when done multiple times.").

By the same token, the fact that Mr. De La Cruz has abided by the conditions set by the immigration court means that the government cannot meet its burden to show that there are no conditions that will reasonably assure his continued appearance. Indeed, this alone establishes the fact that there are conditions that will reasonably assure Mr. De La Cruz's continued appearance. To the extent that the Court perceives some additional risk of flight, the Court could require the payment of a bond in this case as well as location monitoring.

III.   **The allegations in the Indictment are not new and did not cause Mr. De La Cruz to flee while he was released on conditions or dissuade him from seeking release.**

The government highlights the charges in this case as a reason for Mr. De La Cruz to flee prosecution. This claim proves too much and instead simply illustrates how weak the government's argument really is. The Indictment in this case alleges

[7]

two types of offenses. On the one hand, the Indictment alleges that Mr. De La Cruz violated 18 U.S.C. § 1928 by obtaining Vermont drivers privilege cards or learners permits for individuals who did not reside in Vermont. These allegations are not new and involve conduct known to the government prior to Mr. De La Cruz's release in July.[2]

On the other hand, the Indictment alleges violations of 8 U.S.C. § 1324 related to bringing undocumented persons to the United States, transporting such individuals within the United States, or aiding and abetting the offense. But these claims are not new and the government raised the § 1324 allegations as a reason for denying Mr. De La Cruz's motion for release last summer. Doc. 18 at 10; doc. 187 (no. 25-cv-580 (D.Vt.)). Beyond the allegations, Mr. De La Cruz knew that the government sought and obtained a warrant to search his phone because the government highlighted this fact in its opposition. *Id.* Thus, even knowing of the government's claims and of its investigative efforts, Mr. De La Cruz did not flee once he was released. This bears some emphasis because Mr. De La Cruz did not even have to "flee" to avoid prosecution. Instead, had he simply stopped fighting his removal and dropped his efforts to be released, he would almost certainly have been deported well before the government charged him with any crime. Given this, Mr. De La Cruz's fight to be released is both a powerful demonstration of his

---

[2] The government obtained a warrant to search a phone attributed to Mr. De La Cruz on June 20, 2025, and executed the warrant on June 23, 2025. Doc. 1, 3 (no. 25-mj-085 (D.Vt.)). The government's motion for detention in this case and its request for a second warrant in a separate docket make it clear that the § 1928 violations are based on the search of that phone. Doc. 9 (no. 25-mj-101 (D.Vt.)).

[8]

commitment to staying in Vermont with his family as well as tangible proof that he has no interest in fleeing. In this way, the government's longstanding allegations and the history of this case work together to show how meritless the government's claims about the risk of flight really are.

## CONCLUSION

WHEREFORE, Mr. De La Cruz respectfully requests that the Court deny the government's motion for detention and set conditions of release.

Dated: April 1, 2026.

ALEJANDRO B. FERNANDEZ
FEDERAL PUBLIC DEFENDER

By:    /s/ Alejandro B. Fernandez
       Office of the Federal Public Defender
       District of Vermont
       95 Pine Street, Suite 150
       Burlington, Vermont 05401

By:    /s/ Barclay T. Johnson
       Assistant Federal Public Defender
       Office of the Federal Public Defender
       District of Vermont
       95 Pine Street, Suite 150
       Burlington, Vermont 05401

[9]