UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,

v.                                                    2:26-cr-00019-cr

JOSE IGNACIO DE LA CRUZ DE LA ROSA

### Motion to Suppress Tangible and Digital Evidence

Jose De La Cruz De La Rosa, through counsel, respectfully moves this Court

to suppress his cellular phone—obtained during a warrantless car stop on June 14,

2025—and any other evidence obtained in the chain of events following his seizure.

### Background

1.      At around noon on June 14, 2025, Mr. De La Cruz and his daughter

were returning from delivering food to nearby farm workers at Hurtubise and Sons

Farm, a large dairy farm[1] at the very end of Drew Road that straddles the border with

---

[1] Having over 900 milking cows, The Hurtubise and Sons Farm is a large dairy farm by USDA standards. And "[w]hile most such farms are family owned and operated, they rely heavily on hired labor." Economic Research Service/USDA, The Transformation of U.S. Livestock Agriculture: Scale, Efficiency, and Risks (EIB-43).

Available at: https://www.ers.usda.gov/media/14614/introduction.pdf?v=25007

Having that many cows also puts it among the top producers in this milk-focused state, where "[o]nly 9 percent of Vermont dairy farms have more than 700 cows." Mikaela Lefrak & Daniela Fierro, *Vermont has lost more than 400 dairies in the past decade*, Vermont Edition, Vermont Public, April 21, 2025.

Available at: https://www.vermontpublic.org/show/vermont-edition/2025-04-21/new-commisoned-study-shows-americans-consuming-more-dairy-vermont-is-in-the-forefront

Canada.[2] Mr. De La Cruz's food delivery specializes in traditional Mexican cuisine, including pozole, tacos, carne asada, and mojarras fritas. For the seasonal farm workers, the food service is a welcome and nourishing reminder of home.



**Satellite imagery of the sprawling Hurtubise and Sons Farm[3]**

---

[2] Roughly half of the 185-acre dairy farm lies in Canada. *See*, Leon Thompson, *Lyle and Dora Hurtubise Enjoy Their Golden Years on the Farm*, Lancaster Farming, July 12, 2014.

Available at: https://www.lancasterfarming.com/lyle-and-dora-hurtubise-enjoy-their-golden-years-on-the-farm/article_ae206677-d7cc-5f51-b726-318ce1980d14.html

[3] By 2019, the Hurtubise and Sons farm grew pastures and corn on at least 1,500 acres of land. *See*, Sonia Howlett, VT Agency of Agriculture, Food & Markets, Grantee Spotlight: CEAP in Action.

Available at: https://agriculture.vermont.gov/grantee-spotlight-ceap-action

2.      It was a bucolic Vermont day; morning temperatures in the mid 50's rose to just above 70 by midday.  It was sunny with very little cloud cover. But their afternoon ended in crisis. Minutes after dropping the food off, Border Patrol Agent Parent stopped Mr. De La Cruz near the intersection of Main Street and All Saints Cemetery Road in Richford, VT, an approximately 5-minute drive from where Mr. De La Cruz had just come from. Agent Parent claims that he stopped Mr. De La Cruz to conduct an immigration inspection.

3.      According to Border Patrol Agent Parent, his suspicion was first triggered when he saw Mr. De La Cruz's van driving away from the Canadian border on Drew Road. It was allegedly significant that Mr. De La Cruz was driving a passenger van because large capacity passenger vans have been used in illegal crossing events in the past. It is worth noting, however, that the last such instance appears to have been in March of 2024, well over a year prior.

4.      Agent Parent, aware of the Hurtubise and Sons Farm, nonetheless thought it concerning that Mr. De La Cruz was on a road that led to the border. In addition, the Border Patrol Agent claims to have not recognized the van, a fact which struck him as incongruent: he believed he was familiar with all of the vehicles used by the residents on that road. The van had no commercial markings or other indications that it was being used for work, so Agent Parent figured it did not belong in the area.

5.      Border Patrol Agent Parent also noted that the van had a Vermont license plate; in his experience, he claimed, people trying to smuggle others into the

3

country have used local license plates to blend in with traffic and the local population. In addition, he was concerned that upon checking the license plate, the van was registered in the neighboring county, rather than in Franklin County, where they were driving.

6.    Border Patrol Agent Parent reported observing other suspicious behavior, including indications of nervousness and the fact that Mr. De La Cruz did not smile and wave at him as area residents often do. When he ran the plates, the van came back properly registered to Mr. De La Cruz.

7.    Upon stopping Mr. De La Cruz, he and his daughter were questioned about their immigration status in the United States. Having not broken any laws or committed any traffic infractions, Mr. De La Cruz did not know why he was stopped and asked the officers in Spanish whether he was being detained. He also asked in Spanish whether it was a crime not to speak English. Not telling Mr. De La Cruz why they stopped him, officers explained that they just wanted to have a discussion. With neither side satisfied, a supervisory border patrol agent broke the driver's side window of Mr. De La Cruz's van, opened the door, and arrested him.

8.    The earliest report of the incident was completed by Border Patrol on June 17, 2025, some three days after the event itself.  There is no official video recording of the vehicle stop as the Border Patrol agents were not wearing cameras.

9.    Upon arrest, Mr. De La Cruz's phone was seized.[4] A search warrant was ultimately obtained and the phone was searched.  Evidence of the various crimes he was charged with was allegedly found on the phone.

## Legal Memorandum and Argument

10.    In *United States v. Brignoni-Ponce*, 422 U.S. 873, 876 (1975) the Supreme Court rejected the government's argument that "a roving patrol may stop a vehicle in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry." In deciding that a driver's or passenger's Mexican appearance[5] was not enough to stop a car, the Court decided that "our decision is to limit exercise of the authority granted by" the INA subparts 8 U.S.C. §§ 1357 (a)(1) and (a)(3). That is, until that decision, the government believed that someone's Mexican appearance by the border was enough to stop and interrogate them.

11.    The Court reasoned in *Brignoni-Ponce* that rather than unfettered power to ask "any . . . person believed to be an alien as to his right to be or remain in the

---

[4] There appears to be other property in the van that was also seized, including United States currency that Mr. De La Cruz was given for delivering food. The government, however, has not provided a property inventory. Mr. De La Cruz is requesting suppression of any evidence the government intends to use that was found during this car stop.

[5] There is of course no such thing as a "Mexican appearance." As we know, categories of race and ethnicity are social constructions, not bound to any objective facts. Nonetheless, and perhaps precisely because the categories were made by us, their cultural presence enjoys remarkable endurance. A Google image search of "Mexican man" bears this out. The search yields photos of surprisingly homogenous looking people, ones that fit American attitudes about what Mexicans look like. It misses the great expanse of Mexican phenotypes.

United States" without a warrant under 8 U.S.C. § 1357(a)(1), immigration officials need "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. If Border Patrol fails to observe this rule, "[e]vidence seized based on an unreasonable traffic stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *United States v. Harrell*, 268 F.3d 141, 148 (2nd Cir. 2001).

12.    This case unfortunately raises the modern version of this now 50-year-old question. Here again we see the United States Border Patrol clinging to its original inclination; there was little here that justified Mr. De La Cruz's stop apart from his Mexican appearance. This might be expected. Despite *Brignoni-Ponce* rejecting a stop based purely on a person appearing Mexican, it provided for a surprisingly slippery standard—it brought to bear the well-known and well-abused "totality of the circumstances" test. *United States v. Singh*, 415 F.3d 288, 294 (2nd Cir. 2005).

13.    This diffuse standard has had terrible consequences for the Fourth Amendment. Whereas the government once candidly asked the nation's highest Court to allow car stops based on a person's Mexican appearance, it now veils its actions in the language of careful police work.

14.    No single case, or even compendium of cases, purports to give an exhaustive list of what satisfies the "totality" standard. The standard thus nimbly evades any attempt to capture it. At best, the Second Circuit and other appellate

courts have provided for "factors" that "in light of the officer's experience and training" count as reasonable suspicion. *Singh*, 415 F.3d at 294. Thus, there is no surprise when agents attribute nearly any set of facts to the universe of things that, when mixed with their experience, provide reasonable suspicion.

15.    The troubling malleability of the "totality of circumstances" test under the Fourth Amendment is hardly unique to Border Patrol stops. Supreme Court Justice Marshall observed in the context of drug interdiction that suspicion had a "chameleon-like way of adapting to any particular set of observations." *United States v. Sokolow*, 490 U.S. 1, 13 (1989) (quotation marks omitted) (Marshall, J., dissenting).[6]

16.    But even in this atmosphere of near limitless discretion, boundaries must be erected. This case falls on the other side of that wall. It simply cannot be that driving near the border for a perfectly legitimate purpose, in the middle of the day, in

---

[6] Justice Marshall brought to the discussion an illuminating list of contradictions. He asked readers to compare: *United States v. Moore*, 675 F.2d 802, 803 (CA6 1982) (suspect was first to deplane), cert. denied, 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983), with *United States v. Mendenhall*, 446 U.S. 544, 564, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (last to deplane), with *United States v. Buenaventura–Ariza*, 615 F.2d 29, 31 (CA2 1980) (deplaned from middle); *United States v. Sullivan*, 625 F.2d 9, 12 (CA4 1980) (one-way tickets), with *United States v. Craemer*, 555 F.2d 594, 595 (CA6 1977) (round-trip tickets), with *United States v. McCaleb*, 552 F.2d 717, 720 (CA6 1977) (nonstop flight), with *United States v. Sokolow*, 808 F.2d 1366, 1370 (CA9), vacated, 831 F.2d 1413 1987) (case below) (changed planes); *Craemer, supra*, at 595 (no luggage), with *United States v. Sanford*, 658 F.2d 342, 343 (CA5 1981) (gym bag), cert. denied, 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982), with *Sullivan, supra*, at 12 (new suitcases); *United States v. Smith*, 574 F.2d 882, 883 (CA6 1978) (traveling alone), with *United States v. Fry*, 622 F.2d 1218, 1219 (CA5 1980) (traveling with companion); *United States v. Andrews*, 600 F.2d 563, 566 (CA6 1979) (acted nervously), cert. denied *sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979), with *United States v. Himmelwright*, 551 F.2d 991, 992 (CA5) (acted too calmly), cert. denied, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

an ordinary passenger van, with Vermont plates, properly registered to its driver, is enough to get a man and his daughter forcibly stopped and questioned.

17.    Recent decisions by this Court show the difference between where there is reasonable suspicion, and this case. In *United States v. Casasola-Seguero*, 2023 WL 313905, *4 (D. Vt. 2023), for instance, this Court noted the significance of a car appearing to be a rental car with out-of-state plates. In a complete reversal, Border Patrol here is claiming that a Vermont plate is suspicious despite it being properly registered to its driver.

18.    And if it added to the officer's suspicion in *Casasola-Seguero* that a car was driving near the border at 9:45 p.m., then a noon-time drive should reduce suspicion here. But for Border Patrol, it appears the ratchet of suspicion moves in only one direction.

19.    In *United States v. Cruz-Castelazo*, 686 F.Supp.3d 372, 376 (D. Vt. 2023) this Court again noted the significance of out-of-state plates, but went further, noting that "60 to 70 percent of vehicles seized for forfeiture because of involvement in border-related criminal activity are rental vehicles from out of state." The Court discussed the testimony of the officer, finding that the Border Patrol agent was "aware that human and contraband smugglers often use out-of-state rental vehicles for criminal activity at the border." *Id.* at 378. Now claiming that a van with a Vermont plate that is registered to its driver is also indicative of smuggling activity, because smugglers seek to blend in with local traffic, is outlandish.

20.    Other differences are also instructive. In *Cruz-Castelazo*, it was noted that the road the car was traveling on dead ended near the border, "a location that offered no discernible purpose for the sedan's path of travel." *Id.* at 378. Here, we know that Drew Road reaches Hurtubise and Sons Farm.  Hurtubise and Sons Farm is a large commercial operation requiring the labor of many seasonal workers, many of whom are migrants from Mexico.[7] There is a clearly discernible purpose for people to be traveling to and from that direction in the middle of the day. But again, for Border Patrol, suspicion moves ineluctably higher, never tempered by moderating circumstances.

21.    The omission of Hurtubise and Sons' scope of operation from any official testimony or reports highlights the meaninglessness of the Border Patrol agent's supposed knowledge of residents' vehicles. Because the dairy industry thrives on the labor of migrant labor, visiting cars and vans are invariably frequent.

22.    It is also worth noting that a review of this Court's recent decisions show that every type of vehicle seems to have been used in "recent smuggling activity" leaving no vehicle safe to drive without suspicion. *United States v. Casasola-Seguero*, 2023 WL 313905 (D. Vt. 2023) (green SUV); *United States v. Cruz-Castelazo*, 686 F.Supp.3d 372 (D. Vt. 2023) (black sedan); *United States v. Constante-Zamora,* 2023 WL 7545344 (D. Vt. 2024) (blue family utility vehicle).

---

[7] Liliana Mefford, *The migrant labor behind Vermont's dairy industry*, The Vermont Cynic, February 27, 2026.

9

23.    To be sure, this is not the "sort of divide and conquer analysis" that has been rejected by courts. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). In one instance, this is the Border Patrol confronting a fact (Vermont license plate) that is completely opposite to one that they have previously said is suspicious (out-of-state plates) and claiming that it too is suspicious. It again calls to mind Justice Marshall observing that a host of facts and their opposite all give rise to suspicion, simply because an agent says so. *United States v. Sokolow*, 490 U.S. 1, 13 (1989) (Marshall, J., dissenting).

24.    In another instance, it is a refusal of the Border Patrol to give a fair portrayal of all of the attendant circumstances when presenting the "totality of the circumstances." If the totality standard is to be truly embraced in a constitutional democracy, we must be as mindful of the things that dispel suspicion as the things that give rise to it. That is, suspicion is not only additive, it is a dynamic impression in full view of all of the available facts.

25.    One might call the area surrounding Hurtubise and Sons Farm near the border an area commonly used by smugglers, just as we can say that the area surrounding the Burlington federal courthouse is an area that is commonly used by drug dealers. In both instances we would have captured something true, and at the same time, thoroughly obscured the character of the neighborhood to fit a narrow law-enforcement narrative. This sort of editorial slant might make sense for a Border Patrol agent. As the Supreme Court long ago saw:

10

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Johnson v. United States*, 333 U.S. 10, 14 (1948).

26.    Courts, however, mustn't blot out a full and textured reality. The farm and the area near the border are a vibrant commercial hub that supports one of Vermont's largest agricultural sectors. Our courthouse sits at the top of our prized downtown area, bustling with world-class restaurants, entertainment, and shopping. Law enforcement called to testify to justify their arrests would have us believe that everything is suspicious. Thankfully, the world is not so unkind.

27.    In this case, as in countless others, we see a highly curated presentation of facts. It is a characteristic framing of evidence, mapping the evolving legal standard, plucking words from among a small menu of options to be repeated because of their proven success—near the border, an area frequented by smugglers, some transient and undocumented traffic behavior, a nearly ineffable expression or movement, and of course, some recitation of foreignness (except where there is no real foreignness—because the plate was from Vermont, and the car was registered properly to its driver—one is made up. Yes, Vermont plate, but not from this county). *See, e.g., United States v. Constante-Zamora,* 2023 WL 7545344 (D. Vt. 2024) (finding suspicious a car in a remote rural area half mile from the border, during the night, in an area frequently

used for illegal border crossings, that featured strange driving pattern, and the use of out-of-state plates).

28.    The difference here, however, is that in this highly routinized recitation of facts, the usual tropes are not available. It was daytime, on a beautiful day, not dark or stormy. The road serviced a large business, not dead ended in wilderness. There was nothing remarkable about the van, or its driver, or his driving, or its registration, or its Vermont plates.

29.    Undeterred, Border Patrol still spun a narrative of suspicion. The narrative of suspicion was utterly made up though, memorialized for the first time three days after the stop itself. Because the alleged suspicion was both manufactured and unreasonable, Mr. De La Cruz's seizure was unlawful. The evidence that flowed from that unlawful car stop must be suppressed. *See, e.g., United States v. Scopo*, 19 F.3d 777, 781 (2nd Cir. 1994).


WHEREFORE, Mr. De La Cruz respectfully requests that the Court suppress all tangible and digital evidence that flowed from his unlawful seizure or hold a hearing upon this motion.


Dated: August 11, 2026

12

By:   /s/ *Alejandro Fernandez*
Alejandro Fernandez
Federal Public Defender
District of Vermont
95 Pine Street, Suite 150
Burlington, Vermont 05401
(802) 862-6990
Counsel for Jose De La Cruz

13