**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JOSE IGNACIO DE LA CRUZ DE LA ROSA,<br>a/k/a "Nacho,"<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:26-CR-00019-1 |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS, ECF No. 49**

On June 14, 2025, U.S. Border Patrol Agent Brandon Parent saw an out-of-place van approximately one mile south of the international border in an area known to him for illegal border crossings. He watched the driver and passenger react nervously upon seeing him, and he learned that the van, although Vermont-plated, was not registered to a resident of the local community. The van slowed below the speed limit as Agent Parent began to follow it away from the border. Agent Parent stopped the van to investigate, ultimately leading to the Defendant's arrest and the seizure of his cell phone. Because reasonable suspicion supported the stop, the Court should deny the Defendant's motion to suppress the evidence obtained from it.

**Facts**[1]

U.S. Border Patrol Agent Brandon Parent arrived at a pull-off near the intersection of Drew Road and Pinnacle Road in Richford, Vermont, at around noon on June 14, 2025. Agent Parent was in a marked U.S. Border Patrol vehicle that was parked about twenty-five feet from the intersection that forms the southern end of Drew Road. From his location, Agent Parent had a clear line of sight to the north up Drew Road.

[1] The facts in this section are taken from U.S. Border Patrol Agent Brandon Parent's Memorandum of Investigation, attached to this response as Exhibit 1, and his anticipated testimony at any suppression hearing. Details of the November 2024 daytime stop have been provided to defense counsel at the time of this filing.

Drew Road is about a mile long. At the southern end is the intersection where Agent Parent sat in his marked vehicle. At the northern end is a dead end, a farm, and the border between the United States and Canada. The area around Drew Road is extremely rural. The road has few residences and much open farmland. Agent Parent was familiar with most residents of Drew Road and the vehicles that those residents drove. Drew Road is depicted in the image below, which is from Google Maps:




Agent Parent was aware that smugglers have used the area around Drew Road to illegally move aliens into the United States. The open farmland and the proximity of a road north of the international boundary makes border crossings easier, and Drew Road itself connects to Pinnacle Road, which leads away from the border area into the small village of Richford. Smuggled aliens have crossed the border there in a variety of ways, though most commonly they have walked across the border and waited to be picked up in vehicles along Drew Road or Pinnacle Road. The vehicles used in prior events have included large-capacity passenger vans, and Agent Parent was familiar with such incidents. Agent

Parent was also familiar with an incident that occurred in that area during November 2024 in which several aliens walked across the international border during the day.

As he sat in his marked vehicle, Agent Parent saw a grey Ford transit van traveling south on Drew Road. Agent Parent believed, based on his familiarity with Drew Road and its residents, that no one on the road possessed or operated a transit van at that time. He did not recall having seen a similar van on Drew Road before, and he did not observe any commercial markings on the van.

As he watched the van move south along Drew Road and toward the T-intersection with Pinnacle Road, Agent Parent was able to see the driver and a front-seat passenger in the van. They were not wearing the high visibility clothing common to farm workers in the area. They also appeared to get nervous—the driver's and passenger's eyes widened and darted between the road and Agent Parent's marked Border Patrol vehicle. The pair's bodies became stiff and ridged, and the driver's hands clenched the steering wheel. They did not otherwise acknowledge Agent Parent in his marked Border Patrol vehicle, something that locals often did with a wave, smile, or nod.

Agent Parent also saw that the van did not come to a complete stop at the end of Drew Road. Local traffic, Agent Parent knew, routinely came to a complete stop when turning onto Pinnacle Road because of the intersection's poor visibility to the west along Pinnacle Road. The unfamiliar vehicle, the driver's and passenger's body movements, and the van's failure to make a complete stop led Agent Parent to infer that the van did not belong to a local resident and was in a rush to leave after seeing him in his marked Border Patrol vehicle.

The van drove east on Pinnacle Road, toward Richford and Route 105, a road leading further into the United States and eventually to Interstate 89 to the west and Interstate 91 to the east. The van initially moved at a normal rate of speed and, after a brief pause, Agent Parent pulled out to follow it. A wider map of the area, showing the village of Richford, Route 105, and South Main Street, which overlaps Route 105 in part, follows:




The van reduced its speed after Agent Parent pulled out onto Pinnacle Road. Agent Parent noticed the passenger trying to turn and look behind the van, and he saw the driver using the van's side rearview mirror to watch the Border Patrol vehicle. Pinnacle Road becomes River Street as the roadway enters the village of Richford. The van made a complete stop at the intersection of River Street and Main Street in Richford. Around that time, Agent Parent believed he might have seen additional passengers in the van, but the tinted windows made it difficult to see into the van.

The van turned right onto Main Street in Richford, toward Route 105. Agent Parent was aware that drivers in previous smuggling events used this route to leave the border area. Agent Parent requested vehicle record checks on the van's Vermont license plate. Agent Parent was aware from briefings that alien smugglers had recently used vehicles with Vermont license plates to blend in with local traffic and that these vehicles were often registered in more populated towns away from the border area. The records check on the van's Vermont plate revealed the van was registered to Jose De La Cruz De La Rosa of Milton, Vermont. Agent Parent found it unusual that a vehicle registered to Milton, Vermont, would be on Drew Road, which dead ends at the border between the United States

and Canada. The registration further confirmed his belief that the van was not operated by a local resident.

Agent Parent followed the van south through Richford as it continued onto Vermont Route 105 westbound. He turned on his emergency lights and initiated a stop at around 12:07 PM. The van stopped.[2]

Agent Parent notified dispatch of the stop and approached the van. The Defendant cracked his window, and Agent Parent, in English and Spanish, attempted to conduct an immigration inspection. The Defendant refused to answer identity questions or provide his license. Two other agents arrived and took over the attempt to interact with the Defendant. Agent Parent returned to his vehicle. Ultimately, another Border Patrol Agent broke the Defendant's window, removed the Defendant from his van, and arrested him.

Agents located the Defendant's cellular phone during a search incident to arrest and seized it. Agents also recovered cash from both the Defendant's person and the van, as well as a cooler and pellet gun from the van.[3] Agents later acquired search warrants for the Defendant's cell phone and found evidence that the Defendant was involved in both alien smuggling and illegally producing Vermont driver's privilege cards.

## **Legal Standard**

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)); *see also United States v. Knights*, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth

[2] Because the Defendant only challenges reasonable suspicion for the stop, and a stop must be reasonable from its inception, no further facts about Agent Parent's encounter with the Defendant during the vehicle stop are relevant to the suppression analysis. *See United States v. Freeman,* 735 F.3d 92, 96 (2d Cir. 2013). The Government nevertheless provides a short recitation of what happened after the stop to explain the defendant's subsequent arrest and cell phone seizure.

[3] The Government does not intend to offer evidence concerning the cooler, pellet gun, or cash at trial.

Amendment is reasonableness[.]"). "Because the 'balance between the public interest and the individual's right to personal security,' . . . , tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Arvizu*, 534 at 273 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975), and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (further citations omitted). In short, "[i]f 'an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country,' the officer may, consistent with the Fourth Amendment, briefly detain and question the vehicle's occupants regarding their citizenship, immigration status, and any suspicious circumstances." *United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005) (quoting *Brigoni-Ponce*, 422 U.S. at 881-82). Any further detention or search must be based on either consent or probable cause. *Id.*

When evaluating whether an investigatory stop is reasonable, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 266 (citations omitted). Officers may "draw on their experience and specialized training to make inferences and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quotations and citations omitted). "Reasonable suspicion depends on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Navarette v. California*, 572 U.S. 393, 402 (2014) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Moreover, reasonable suspicion is an objective standard that "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

"Factors that, in light of the officer's experience and training, may give rise to reasonable suspicion include: (1) characteristics of the area where the vehicle is found; (2) its proximity to the

border; (3) usual traffic patterns on that road; (4) previous experience with alien traffic in the area; (5) recent information about specific illegal border crossings there; (6) the driver's behavior, such as attempting to evade officers; (7) characteristics of the vehicle itself; and (8) the appearance of persons in the vehicle, such as mode of dress." *Singh*, 415 F.3d at 294 (citing *Brignoni-Ponce*, 422 U.S. at 884-85; *United States v. Sugrim*, 732 F.2d 25, 30 (2d Cir. 1984)). This list is not exhaustive, and the fact that some factors indicate suspicious behavior while others may indicate innocent conduct does not defeat a finding of reasonable suspicion. *See id.* at 294-95. "[A]s the Supreme Court has held, the reasonable suspicion standard does not require officers to 'rule out the possibility of innocent conduct' before responding to the circumstances confronting them." *United States v. Weaver*, 9 F.4th 129, 148 (2d Cir. 2021) (quoting *Navarette v. California*, 572 U.S. 393, 403 (2014)) (further citations omitted).

The stop must be justified at is inception, as "[a]ny events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman,* 735 F.3d 92, 96 (2d Cir. 2013). Nevertheless, "[t]he Fourth Amendment seeks to prevent arbitrary police action, not to require absolute certainty before law enforcement officers may investigate." *United States v. Villalobos*, 161 F.3d 285, 292 (5th Cir. 1998). As the Supreme Court noted in *Wardlow*, "*Terry* recognized that the officers could detain the individuals to resolve the ambiguity" between innocent and criminal conduct. *Wardlaw*, 528 U.S. at 125 (citing *Terry*, 392 U.S. at 30).

**Argument**

Agent Parent had reasonable suspicion to stop the Defendant's grey Ford transit van and investigate possible criminal activity. The Defendant, who along with his passenger appeared to become nervous upon seeing Agent Parent, was driving his van away from an area known to Border Patrol Agents assigned to the area for alien smuggling activities. Border Patrol had recently observed a similar van loading suspected illegal aliens along that same road. Moreover, Agent Parent had also

recently seen an illegal border crossing event occur during the middle of the day at the end of the same road. Upon having his initial suspicions affirmed by the vehicle's non-local registered address, and after seeing the vehicle slow as he began to follow it, Agent Parent stopped the van with reasonable suspicion of an immigration violation. The totality of the circumstance thus supports finding reasonable suspicion in this case and the Court should deny the suppression motion.

**I. Drew Road was a hotspot for alien smuggling, something Agent Parent knew from personal experience.**

As Agent Parent knew, Drew Road is an area where alien smugglers previously brought aliens into the United States, including during daylight hours, and using a high-capacity passenger van. These factors support finding reasonable suspicion for the stop in this case. "It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." *United States v. Nichols*, 142 F.3d 857, 870 (5th Cir. 1998); *see also*, *e.g.*, *Singh*, 415 F.3d at 295 (observing that driving on a rural road near the border between the United States and Canada in a vehicle favored by alien smugglers and where aliens were known to illegally cross through the woods can support reasonable suspicion); *Villalobos*, 161 F.3d at 291 (citing, among other factors, the fact that the suspect "was traveling through a sparsely populated border region along a notorious smuggling route" as one factor supporting reasonable suspicion); *Arvizu*, 534 U.S. at 277 (citing, among other factors, the fact that the stop happened "along a little-traveled route used by smugglers" to avoid a checkpoint as a factor supporting reasonable suspicion). This factor is present in this case in three related ways.

*First*, Drew Road's reputation for alien smuggling activities is well-known to Border Patrol Agents assigned to the Richford Station. Numerous illegal border crossings have occurred in the vicinity using a variety of methods of entry and transportation. As Border Patrol Agent Parent will testify, he knew of this reputation because Drew Road would be often discussed during morning briefings before he departed for his shift in the field. He also knew that incidents in which vehicles drove across the border near Drew Road were enough of a problem to lead Border Patrol to place

physical barriers at and near the border. Foot crossings, where the illegally entering aliens were expected to be picked up in the United States, were also common in that area.

*Second*, Agent Parent was personally involved in a prior interdiction event involving the illegal entry of migrants near Drew Road, an event that occurred during the day. On November 14, 2024, at around 11:45 AM, Agent Parent helped apprehend four aliens who illegally crossed the border near Drew Road. During that event, Border Patrol Agents were walking "the slash," a narrow clearing of vegetation along the international border, when they observed four individuals illegally crossing the border into the United States and arrested them. Agent Parent was therefore aware that illegal entries had occurred in the Drew Road area during daylight in addition to nighttime hours. The time of day is one factor for law enforcement to consider, but, as courts have noted, just because illegal activity may happen more frequently at night does not mean that it "somehow evaporate[s] during the daytime, only to re-materialize at nightfall." *See Weaver*, 9 F.4th at 151. Here, Agent Parent's own experience showed that alien smuggling activity did not evaporate during the day along Drew Road. And although the presence of a large-capacity van near a border farm during the day could have had a non-criminal explanation, Agent Parent did not need to "rule out the possibility of innocent conduct" before responding to the circumstances confronting him. *See id.* at 148. Agent Parent was instead allowed to act reasonably to investigate the apparently non-local van for suspected criminal activity. *See Wardlaw*, 528 U.S. at 125.

*Third*, Agent Parent was aware that a high-capacity van very similar to the Defendant's had previously been involved in picking up aliens near the Hurtubise Farm on Drew Road. Based on his training and experience, Agent Parent was aware that high-capacity vehicles are favored by smugglers. Their use can support reasonable suspicion. *See Singh*, 415 F.3d at 295 (discussing a high-passenger-capacity vehicle as an indicator of alien trafficking activity). Here, Agent Parent was familiar with one of the types of vehicles used by alien smugglers near Drew Road, and observed the Defendant's van

to be of that type and in that location. This factor, too, weighs in favor of finding that Agent Parent had reasonable suspicion to stop the Defendant's van.

## II. The Defendant's van was suspicious because the van was out of place on Drew Road, which is a short road ending at the border itself.

To assess the totality of the circumstances surrounding a roving Border Patrol stop, courts should also analyze the area in which the challenged stop occurred. *See Singh*, 415 F.3d at 294. "Proximity to the border can be a 'paramount factor' in assessing reasonable suspicion." *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011) (citation omitted); *see also Nichols*, 142 F.3d at 867 ("Although a reasonable conclusion of proximity to the border does not alone constitute reasonable suspicion for a Border Patrol stop that is not at the border or its functional equivalent, this 'vital element' contributes significantly to the reasonableness of the Border Patrol agents' suspicion."). Proximity plays such a paramount role in this analysis because a vehicle found and stopped closer to the border is more likely to have begun its journey at the border. *See United States v. Jones*, 149 F.3d 364, 368 (5th Cir. 1998). Likewise, an area's characteristics and local traffic patterns might mark a particular vehicle as out of place. *See Nichols*, 142 F.3d at 869–71 (discussing how a suspect's truck was out of place and how that deviation supported reasonable suspicion); *see also Villalobos*, 161 F.3d at 291 (citing, as one factor in affirming that stopping agents had reasonable suspicion, the agents' recognition that the suspect's truck was not a local vehicle).

These factors weigh heavily in support of finding reasonable suspicion to stop the Defendant's van to investigate a possible immigration crime. As to the "paramount factor" of proximity to the border, Agent Parent first spotted the Defendant's van within a mile of and travelling away from the border, on a road that both terminates at the border and has no other roads branching from it before it reaches the intersection where Agent Parent was parked. Based on location alone, Agent Parker could reasonably suspect that the vehicle had come from the border. *See Jones*, 149 F.3d at 368. Moreover, the area around Drew Road is rural. The road has only a few houses, woods, a farm, and

agricultural land adjacent to it. These characteristics mean that the road had limited local traffic. Agent Parent was familiar with both the traffic patterns and the vehicles which regularly used the road. He recognized the van to be out of place, noting both that he did not know any residents living on Drew Road to have a van like the Defendant's and that the Defendant's van lacked advertising logos that would mark it as a commercial vehicle. *See Nichols*, 142 F.3d at 869–71; *Villalobos*, 161 F.3d at 291. Agent Parent was also aware that the area's rural characteristics could facilitate alien smuggling by concealing aliens moving across the border on foot. Coupled with Drew Road's connection to Pinnacle Road (and therefore other roads leading further into Vermont and away from the border), the area's characteristics make Drew Road a popular place for illegal border crossings, something borne out by agents' experience.

The Defendant's unsupported assertion that "visiting cars and vans are invariably frequent" at dairy farms like the Hurtubise Farm, Def.'s M. Suppress, ECF No. 49 at 9, is a red herring. A vehicle can raise reasonable suspicion even if similar vehicles are otherwise common on a road but the stopped vehicle appears out of place to the stopping officer. *See Nichols*, 142 F.3d at 864, 869–70 (discussing the particular facts showing why the stopped utility vehicle was out of place despite utility vehicles being common on that stretch of road). And in this case, Agent Parent's observations provided him with articulable facts about local traffic and why the Defendant's van was out of place. Indeed, Agent Parent's familiarity with vehicles that frequented the road would include farm vehicles that regularly traveled on it. He could therefore reasonably suspect that the Defendant's van was involved in criminal activity rather than normal farm business.

In sum, the facts that the Defendant's van was very close to the border, was traveling away from the border, and was out of place on Drew Road all supported Agent Parent's reasonable suspicion that the Defendant's van may have been involved in illegal activity.

**III. The Defendant's and his passenger's reaction to seeing Agent Parent, followed by confirmation that the Defendant's van was not local, also supports finding reasonable suspicion in this case.**

When the Defendant and his passenger saw Agent Parent in his marked Border Patrol vehicle, they stiffened and did not acknowledge Agent Parent, which Agent Parent found unusual based on his experiences in the area. The Defendant then gripped the steering wheel more tightly before failing to make a complete stop at the end of Drew Road. These actions, particularly after Agent Parent confirmed that the van was not local to the Richford area, further support finding reasonable suspicion in this case.

It is "quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona)." *Arvizu*, 534 U.S. at 275–76. *See also United States v. Garcia*, 118 F. App'x 690, 693 (4th Cir. Dec. 16, 2004) (reversing suppression of traffic stop evidence where district court failed to properly consider the time of day, which made it unusual for the suspect to fail to acknowledge an officer on a deserted road); *United States v. Pacheco-Espinosa*, 354 F. Supp. 2d 1219, 1225 (D.N.M. 2003) (finding reasonable suspicion based, in part, on suspect's "tense and uneasy" reaction to law enforcement and abrupt turn into a gas station).

Here, the area around Drew Road is much closer to a remote area of southeastern Arizona than the busy San Francisco highway. Agent Parent's experience was that locals normally acknowledged his presence. The Defendant and his passenger had the opposite reaction, which drew Agent Parent's further attention. Likewise, the Defendant then failed to completely stop at the end of Drew Road. Agent Parent knew that the intersection of Drew Road and Pinnacle Road was dangerous due to poor visibility for traffic coming from the west and caused locals to come to complete stops. He therefore found the van's abrupt maneuver unusual and an indicator that the van's occupants were

in a rush to leave an area known for alien smuggling. He also noticed that Defendant and his passenger were not wearing what Agent Parent had often seen farmworkers wear. All of these factors raised questions about whether the van was involved in illegal activities and caused Agent Parent to start following the Defendant's van.

When he did, Agent Parent then (1) saw the Defendant's van slow even though it had been travelling at a normal rate of speed, (2) watched the Defendant and his passenger try to watch Agent Parent's vehicle behind them, (3) thought he might have seen additional individuals in the van through tinted windows, and (4) ran the license plates on the Defendant's van by calling Swanton Sector Dispatch. While it may not be suspicious for a speeding car to slow down after seeing a marked car, "noticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion," and "[s]uch deceleration may be additionally suspicious when the car was not speeding to begin with." *Villalobos*, 161 F.3d at 291. And although Agent Parent was ultimately mistaken about there being additional individuals in the van, "a mistake of fact does not undermine the existence of reasonable suspicion." *See United States v. Jenkins*, 452 F.3d 207, 212–13 (2d Cir. 2006) (citing cases). Finally, Agent Parent learned that the van was registered out of Milton, Vermont, a pattern that conformed to information that alien smugglers may have been using vehicles with Vermont plates to avoid detection. The Defendant's behavior and the confirmation of the van's registration thus further supported reasonable suspicion for the investigatory stop.

## IV. The totality of the circumstances supported the vehicle stop.

When evaluating whether an investigatory stop is reasonable, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 266 (citations omitted). Here, as outlined above, Agent Parent drew reasonable suspicion from the combination of the van's proximity to the border, Drew Road's role as a hotspot for illegal entry into the United States, the fact the van

appeared to be out of place on Drew Road, the behavior of the van's occupants, and the registration of the van to a resident of a Vermont outside the immediate area. The combination of these circumstances, not any one circumstance, created reasonable suspicion to stop the van and investigate a potential crime.

In his motion, the Defendant does not appear to dispute these articulable facts. He instead calls the reasonable suspicion standard and totality of the circumstances test a "diffuse standard [that] has had terrible consequences for the Fourth Amendment." Def.'s M. Suppress, ECF No. 49 at 6. And even as he acknowledges that courts have rejected the approach, the Defendant engages in a "divide and conquer analysis" by picking out and knocking down singular aspects of Agent Parent's account. *Id.* at 8–10 (quoting *Arvizu*, 534 U.S. at 274). This Court should decline the Defendant's invitation to revisit established law. "The touchstone of the Fourth Amendment is reasonableness." *Knights*, 534 U.S. at 118. There was nothing unreasonable about Agent Parent's decision to stop the Defendant's van, much less anything that warrants questioning Supreme Court precedent.

Rather, the Court should apply the totality of the circumstances test, and, in doing so, it should find that the facts articulated by Agent Parent show that he had reasonable suspicion to stop the Defendant, who noticeably reacted to Agent Parent's marked vehicle, in his van, which appeared to be in a rush to get away from an alien smuggling hotspot.

## Conclusion

For the reasons set forth above, the Court should deny the Defendant's motion, ECF No. 49.

Respectfully submitted,

UNITED STATES OF AMERICA

JONATHAN A. OPHARDT
First Assistant United States Attorney

By: /s/ *Joshua L. Banker*
Joshua L. Banker
Assistant U.S. Attorney
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
joshua.banker@usdoj.gov